**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

**JASON SCOTT BALLARD,**                    Case No. 5:18 CV 1878

      Plaintiff,                                    Judge James Gwin

      v.                                            Magistrate Judge James R. Knepp II

**COMMISSIONER OF SOCIAL SECURITY,**

      Defendant.                                   **REPORT AND RECOMMENDATION**

### INTRODUCTION

Plaintiff Jason Scott Ballard ("Plaintiff") filed a Complaint against the Commissioner of Social Security ("Commissioner") seeking judicial review of the Commissioner's decision to deny disability insurance benefits ("DIB"). (Doc. 1). The district court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). This matter has been referred to the undersigned for preparation of a report and recommendation pursuant to Local Rule 72.2. (Non-document entry dated August 15, 2018). Following review, and for the reasons stated below, the undersigned recommends the decision of the Commissioner be reversed and remanded for further proceedings.

### PROCEDURAL BACKGROUND

Plaintiff filed for DIB in January 2016, alleging a disability onset date of July 1, 2015. (Tr. 200-01).[1] His claims were denied initially and upon reconsideration. (Tr. 131-39, 141-47). Plaintiff then requested a hearing before an administrative law judge ("ALJ"). (Tr. 150-51). Plaintiff (represented by counsel), and a vocational expert ("VE") testified at a hearing before the ALJ on

---

1. Plaintiff was previously found disabled for a closed period from December 23, 2012 through February 11, 2014 based on a February 2013 application. *See* Tr. 78-93.

January 11, 2018. (Tr. 32-77). On February 15, 2018, the ALJ found Plaintiff not disabled in a written decision. (Tr. 15-25). The Appeals Council denied Plaintiff's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1-6); *see* 20 C.F.R. §§ 404.955, 404.981. Plaintiff timely filed the instant action on August 15, 2018. (Doc. 1).

## FACTUAL BACKGROUND

Personal Background and Testimony

Plaintiff was born in August 1973, making him 42 years old on his alleged onset date. *See* Tr. 37, 200. He originally alleged disability due to degenerative disc disease, obstructive sleep apnea, irritable bowel syndrome, high blood pressure, depression, learning disorder, kidney removal, chronic pain, past kidney cancer, and thrush. (Tr. 220). Plaintiff had past work as an electrician, truck driver, and machinist, and stopped working in July 2015. (Tr. 39-41).

Plaintiff believed he was unable to work due to left flank pain and dizziness on exertion and bending. (Tr. 43); *see also* Tr. 48. He stated the dizziness started when his left kidney was removed in late 2015. (Tr. 43-44). Plaintiff had stage two kidney disease in his remaining kidney. (Tr. 47-48). He also had a hernia repair in October 2017; this was his fourth such repair, and it did not provide relief. (Tr. 45-47). He was careful with lifting, moving, and twisting so as not to aggravate the hernia. (Tr. 47). Plaintiff also testified to a 2013 back surgery from which he still suffered complications. (Tr. 45). He previously received some back pain relief from injections, but stopped getting them due to financial reasons. (Tr. 50). He had similarly stopped pain management "because of problems with money" and effectiveness. (Tr. 63).

Plaintiff was dizzy every day when exerting himself, or bending down. (Tr. 49). Plaintiff testified doctors were uncertain the cause of his dizziness. (Tr. 48-49). He was seeing an eye

2

doctor, who believed he might have shingles in his cornea, and had seen a neurologist. *Id.* He did

not undergo the neurologist-recommended vestibular therapy for financial reasons. (Tr. 49).

Plaintiff saw his primary care physician Dr. Peiffer every three months. (Tr. 52). She

treated him for his dizziness, among other things, and sent him to a neurologist for follow up. *Id.*

Plaintiff did not believe he could lift anything in large quantities, and reported Dr. Fenton

had advised him not to lift over twenty pounds. (Tr. 52-53). He did not believe he could bend down

and pick something up. (Tr. 53). He testified he could not sit for lengthy periods due to his back

problem. (Tr. 54). Plaintiff could stand in place for ten minutes. (Tr. 64). He could walk on flat

surfaces if he was careful, but slopes caused problems due to his back and kidney. *Id.* Plaintiff

testified to back discomfort after about 45 minutes of sitting. (Tr. 64-65).

Plaintiff testified he was able to drive short distances to the store, but anything over "an

hour and a half or so" caused back problems. (Tr. 38-39). On a typical day, Plaintiff helped get his

kids ready for school (Tr. 57-58) ("I help them get breakfast and stuff going and get them on the

bus."), and help his father-in-law "get on the ride to dialysis" and then prepare him lunch when he

returned (Tr. 58). He also did light cleaning, including vacuuming. *Id.* When his children returned

from school, he got them a snack, helped with homework, and "tried] to prepare dinner". (Tr. 59).

Plaintiff was training to be a Freemason and sometimes went to meetings. *Id.* He was "very

limited" in his ability to do yardwork, and mowed the grass using a riding lawnmower. *Id.* He

grocery shopped, but only with his wife; he could walk around the store, but was hesitant to pick

things up due to his back and his hernia. (Tr. 63).

The ALJ asked Plaintiff about a record regarding hiking in North Carolina. (Tr. 54).

Plaintiff responded that he traveled to see family and "walk[ed] around", but it was not "a hiking

trail of any sort." (Tr. 55). Plaintiff also testified that he "did play some golf" approximately twice per month the prior year but "played very poorly"; he had to swing "[v]ery lightly". (Tr. 55-56).

Plaintiff saw Dr. Lauren Alexander once per month, but then did not see her for some time because she had a baby. (Tr. 50-51). He last saw her in December 2017, and had an appointment scheduled for later in January 2018. (Tr. 51). He was "kind of reluctant" to try group therapy. (Tr. 52). Plaintiff testified to difficulty concentrating and reading. (Tr. 61). He was in special education classes from second grade onward, and had a fourth-grade reading level. (Tr. 66).

Relevant Medical Evidence

*Physical Health*

Prior to his alleged onset date, Plaintiff was diagnosed with renal cell carcinoma of the left kidney in 2010. *See* Tr. 336. He had a left partial nephrectomy in January 2011. *See id.* He had repair of incisional herniorrhaphy with mesh at the sight of the previous partial left nephrectomy in 2012. *See* Tr. 415. Plaintiff also underwent a laminectomy in 2007 and disc surgery in 2009, *see* Tr. 292, and a L3-L5 laminectomy with L4-S1 posterior fusion in 2013, *see* Tr. 415.

Plaintiff saw Leann Whyte, C.N.P., and Robert Geiger, M.D., at Summit Pain Specialists in March 2015 for a routine follow-up regarding lumbar spine pain. (Tr. 680-81). Plaintiff reported a recent hospitalization for vertigo and left eye nystagmus; he also reported numbness and weakness in his legs. (Tr. 680). He ambulated "without difficulty", but had pain to palpation in his lumbar spine and limited range of motion. *Id.*

In July 2015, Plaintiff saw Erica Gersteinmaier, PA-C, of Physicians Urology Center for Urologic Health for left flank pain and swelling. (Tr. 336-41). She noted Plaintiff's most recent abdominal CT showed a left renal mass. (Tr. 336). Plaintiff also went to the emergency room in

4

July 2015 reporting a headache and left flank pain following a nephrostomy tube placement. (Tr. 601). He was discharged with diagnoses of shingles and flank cellulitis. (Tr. 605).

An August 2015 abdominal CT revealed mild degenerative changes in the spine with posterior decompression of the lumbar spine. (Tr. 585-86). It also showed mild increased inflammatory changes in the left kidney "raising question of infectious process." (Tr. 586).

Plaintiff returned to the Urology Center in September, at which time Lawrence Gellar, M.D., recommended a nephrectomy. (Tr. 296). In November, Plaintiff underwent an open left radical nephrectomy and surgical repair of a left flank hernia. (Tr. 357-58, 427-28). At a December post-operative evaluation, Dr. Geller noted Plaintiff had no residual cancer. (Tr. 278).

Also in November 2015, Plaintiff saw Ms. Whyte and Michael Louwers, M.D., at Summit Pain Specialists for lumbar spine pain. (Tr. 643-46). Plaintiff reported his current pain management regimen allowed him to do activities of daily living and be more physically active. (Tr. 644).

Plaintiff saw primary care physician, Kelli Peiffer, D.O., in December 2015. (Tr. 737-44). Plaintiff reported continued dizziness and fatigue; he expressed disappointment that his surgery had not resolved these symptoms. (Tr. 737). Plaintiff's physical examination was unremarkable. (Tr. 739-40). Dr. Peiffer referred Plaintiff to rheumatology. (Tr. 740).

In January 2016, Plaintiff saw Sabrina Barros, PA-C, and Dr. Louwers of Summit Pain Specialists, to evaluate low back/kidney pain. (Tr. 639-42). Plaintiff ambulated "without difficulty", but had lumbar spine pain to palpation and positive facet loading. (Tr. 641). The providers assessed displaced lumbar disc, lumbar disc degeneration, postlaminectomy syndrome of lumbar spine, and neuropathy. *Id.*

Also in January 2016, Phillip Wilcox, M.D., noted Plaintiff "had been doing reasonably well with his back until he underwent a nephrectomy", but subsequently developed increased pain,

including bilateral leg pain, but no numbness or tingling. (Tr. 708). Dr. Wilcox noted Plaintiff was "fully ambulatory" with "reasonable lumbar flexion" and negative straight leg raising. (Tr. 710). His impression was back pain with sciatica; he prescribed medication and instructed Plaintiff to "do exercises on his own" and return in one month. *Id.*

In February 2016, Plaintiff underwent a rheumatology consultation with James Goske, M.D. (Tr. 718-22). He reported neurologic symptoms of uncertain cause, left-sided body aches, fevers of uncertain cause, and a positive ANA. (Tr. 718). Plaintiff reported at this visit that "the visual symptoms and dizziness are less". *Id.* On examination, Dr. Goske noted normal gait, strength, tone, and reflexes, as well as normal range of motion in the cervical spine, lumbar spine, shoulders, elbows, hands, and ankles. (Tr. 719). Plaintiff had no tenderness to palpation in his lumbar spine. *Id.* He had "multiple, pronounced" tender points. *Id.* Dr. Goske assessed polyarthralgia, myalgia, fever, raised antibody titer, other malaise, and bone pain. (Tr. 720).

Plaintiff returned to Dr. Peiffer in February 2016, reporting back problems, and an episode of left-sided chest pain. (Tr. 729). Dr. Peiffer assessed, *inter alia*, chronic low back pain, and provided a requested referral to a new pain management specialist. *See* Tr. 729-33.

Plaintiff returned for a second visit with Dr. Geller in February 2016, reporting left-sided pain, passing bubbles in urine, and proteinurea. (Tr. 825). Plaintiff also returned to Dr. Goske, who, on examination, made similar findings to his prior visit. (Tr. 852). He assessed, *inter alia*, fibromyalgia, chronic pain, disc degeneration, abnormal finding of blood chemistry, and leukocytosis. (Tr. 852). Dr. Goske noted that "although autoimmune disease was suspected . . . all testing for connective tissue disease or autoimmune illness underlying his many concerns was not found." He noted Plaintiff's "widespread and burning pain" was from fibromyalgia. (Tr. 853).

6

In April 2016, Plaintiff denied fatigue, fever, nausea, abdominal pain, vomiting, diarrhea, arthralgias/joint pain, dizziness, muscle aches or weakness, and back pain. (Tr. 908). Plaintiff was diagnosed with hypertension, chronic back pain, and stage one chronic kidney disease. (Tr. 909).

Plaintiff also returned to Dr. Peiffer in April 2016. (Tr. 911-15). He had high blood pressure, which nephrology managed. (Tr. 911). He reported headaches, visual changes; he was "extremely dizzy with slight movement" and "ha[d] felt this way since surgery in November." *Id*. Plaintiff's new pain management physician wanted to wean certain medications, which resulted in increased pain. *Id*. Dr. Peiffer assessed hypertension, other chronic pain, and visual changes. (Tr. 915). She referred Plaintiff to ophthalmology. *Id*.

In August 2016, Plaintiff underwent a functional capacity evaluation with G. Kurt Swanson, a physical therapist with the Edwin Shaw Rehabilitation Institute. (Tr. 1214-20). Mr. Swanson noted Plaintiff was unable to complete lifting exercises and complained of dizziness, headache, and lower back pain when attempting. (Tr. 1216). Plaintiff similarly complained of headache and dizziness when pushing and pulling. *Id*. Plaintiff reported similar pain, with additional lower back pain, when forward bending, sitting, standing, walking, crouching, kneeling, and climbing stairs. (Tr. 1217). Plaintiff required two hand rails to climb stairs. *Id*. On examination, Mr. Swanson noted Plaintiff's shoulder, elbow, forearm, and wrist range of motion were within normal limits; strength was 4+. (Tr. 1219). Plaintiff had some reduced hip range of motion, and mostly 3+ to 4 muscle strength in hips, knees, and ankles. *Id*. He had normal sensation. (Tr. 1220). Mr. Swanson assessed: obesity, poor posture habits, decreased trunk and lower extremity range of motion/flexibility, trunk weakness, lower extremity weakness, left flank swelling, and decreased balance in standing. *Id*.

7

Plaintiff saw Dr. Wilcox in October 2016, reporting a flare-up of back pain with some radiation to his buttocks. (Tr. 983). On examination, Plaintiff ambulated normally and was "able to stand and bear weight without difficulty". (Tr. 987). He had no paralumbar spasm or tenderness, and a negative straight leg raising test. *Id.* Later that month, an abdominal CT showed a stable hernia, and a small middle lobe pulmonary nodule. (Tr. 1055-56).

Plaintiff went to the emergency room in November 2016 with abdominal pain. (Tr. 1040). A CT scan showed "[n]o acute . . . abnormality", a small ill-defined area of low attenuation within the right hepatic lobe, and a broad-based hernia along the left flank. (Tr. 1052).

In December 2016, Plaintiff told Dr. Wilcox he was having nerve pain with radiation to his right leg. (Tr. 975). On examination, he was "able to stand and move [around] room slowly". (Tr. 979). Dr. Wilcox assessed recurrent sciatica. *Id.*

In January 2017, Plaintiff underwent surgery to excise a suture granuloma of the left flank. (Tr. 1004). That same month, Plaintiff returned to Dr. Wilcox regarding his lumbar radiculopathy. (Tr. 969-73). On examination, Plaintiff had decreased range of motion in his lumbar spine. (Tr. 973). Dr. Wilcox did not recommend surgery; he referred Plaintiff to pain management. *Id.*

A February 2017 abdominal CT showed no findings to suggest recurrent or metastatic disease, fatty liver, and an "essentially unchanged" left-sided lumbar hernia. (Tr. 1068). That same month, Plaintiff returned to Dr. Peiffer for his abdominal pain, which he reported included nausea, vomiting, and diarrhea. (Tr. 1181). Plaintiff also reported "dizzy episodes". *Id.* On examination, Dr. Peiffer noted tenderness and guarding in Plaintiff's abdomen. (Tr. 1185). She assessed diverticulitis of the large intestine and hypertension. (Tr. 1185-86).

Also in February 2017, Plaintiff saw neurologist Ahmed Itrat, M.D., for dizziness and vision loss. (Tr. 1634-43). Specifically, Plaintiff described symptoms of dizziness that were more

pronounced with looking down or standing up. (Tr. 1634). Dr. Itrat noted brain MRIs had not revealed any demyelinating pathology. (Tr. 1634). On examination, Dr. Itrat noted that a "[t]rial of downgaze brings about symptoms of vertigo and he is unable to keep eyes open to appreciate any nystagmus". (Tr. 1639). Plaintiff had a normal motor and strength examination. *Id.* His muscle stretch reflexes were diminished bilaterally, and he had reduced sensation over his lower and upper extremities. *Id.* His gait was normal and his Romberg's test was "weakly positive." *Id.* Dr. Itrat noted the etiology of Plaintiff's dizziness was "likely multifactorial." (Tr. 1642). He suspected it might be due to inner ear dysfunction, or cervical disc disease. *Id.* He recommended a cervical spine MRI, a check of serum B12 levels, and vestibular therapy; he prescribed medication and referred Plaintiff to an ENT. *Id.*

In April, Plaintiff told Dr. Peiffer his pain medication helped, and that he was motivated to try to lose weight. (Tr. 1273). He noted there were "times where he can barely walk", *id.*, and reported dizziness (Tr. 1274). On examination, Plaintiff had abdominal tenderness. (Tr. 1277). Dr. Peiffer assessed, *inter alia*, intermittent vertigo and imbalance, and refilled Plaintiff's medications. (Tr. 1278). Dr. Peiffer continued to recommend regular aerobic exercise for Plaintiff's hypertension, and urged him to start therapy for his depression. *Id.*

A cervical spine MRI that same month revealed a small central extruded disc fragment at C4-C5, multilevel central stenosis, most significant at C4-C5 and C5-C6, multilevel degenerative foraminal stenosis bilaterally, and mild reversal of the normal cervical lordosis. (Tr. 1284-85). There was "no definitive imaging evidence of metastatic tumor involvement." (Tr. 1285).

Also in April, Plaintiff saw Karl Schwarze, M.D., who assessed chronic stage two kidney disease, "mild". (Tr. 1223). Progress notes from Dr. Schwarze from April 2016 through January 2018 reveal Plaintiff denied difficulty dressing, bathing, doing errands alone, walking, or climbing

stairs. (Tr. 1222, 1225, 1228, 1232, 1235, 1670, 1746). These notes also contain consistent observations of a normal gait. (Tr. 1223, 1227, 1230, 1233, 1236, 1671, 1747). Dr. Schwarze continued to assess stage two kidney disease through January 2018. (Tr. 1671, 1747).

In June 2017, Plaintiff saw Gary Bollin, M.D., in infectious disease, for recurrent sinus track left nephrectomy/hernia repair. (Tr. 1260-61). Dr. Bollin noted Plaintiff responded to antibiotics, but believed there was "a fairly high probability that he will have recurrent drainage and require additional evaluation" and possibly need surgery to remove infection. (Tr. 1261).

A July 2017 abdominal MRI showed an absent left kidney, small gallstone or polyp, a broad-based left-sided lumbar hernia, and fatty liver. (Tr. 1270-71). Following the MRI, Plaintiff saw Andrew Fenton, M.D., who observed left flank tenderness at the hernia site "stable from prior visits" and epigastric tenderness. (Tr. 1610). He assessed a flank hernia, epigastric pain, and calculus of gallbladder. (Tr. 1611). In September, Plaintiff's hernia was "still quite symptomatic". (Tr. 1683). Dr. Fenton performed a hernia repair surgery in October. (Tr. 1717). A subsequent CT scan showed gas and fluid collection at the site of the hernia repair, which "likely represent[ed] hematoma and surgically introduced gas". (Tr. 1716).

From January to July 2017, Plaintiff underwent pain management for his low back and leg pain, which included trigger point injections. *See* Tr. 1307-1415, 1526-45. During these visits, providers noted diagnoses of, *inter alia*, myalgia, myofascial pain, lumbar radiculopathy, flank pain, other chronic pain, degeneration of lumbar or lumbosacral intervertebral disc, and lumbosacral spondylosis. *See id.* In May and June 2017, Plaintiff reported he was doing well on Topiramate twice per day (Tr. 1321, 1349); his gait was noted to be abnormal but "much improved" (Tr. 1325, 1354). He had reduced range of motion, pain, and spasm in his lumbar spine,

10

but normal sensation, strength, reflexes, and sensation, as well as a normal straight leg raise test. (Tr. 1325, 1353-54).

*Opinion Evidence*

In March 2016, State agency physician Edmond Gardner, M.D., reviewed Plaintiff's records and opined Plaintiff could perform light work, standing and walking for four hours per day. (Tr. 106). He could occasionally balance, stoop, kneel, crouch, crawl, and climb ramps and stairs, but never climb ladders, ropes, or scaffolds. *Id.* Dr. Gardner opined Plaintiff needed to avoid : 1)concentrated exposure to respiratory irritants, and 2) all hazards. *Id.* Dr. Gardner noted this was an adoption of a prior decision dated January 26, 2015. *Id.*; *see* Tr. 82-93 (prior decision). In June 2016, State Agency physician Michael Delphia, M.D., confirmed Dr. Gardner's opinion. (Tr. 120).

Mr. Swanson offered an opinion regarding Plaintiff's functional abilities after his August 2016 evaluation. (Tr. 1214-20). He noted Plaintiff had "significant limitations in essentially all activities tested", citing poor trunk and lower extremity strength, range of motion, flexibility, and decreased balance in standing. (Tr. 1215). He opined Plaintiff should avoid lifting over five pounds occasionally, avoid carrying, and avoid lifting from waist to floor. (Tr. 1216). He could rarely[2] perform elevated work, sit, stand, walk, or kneel, and should avoid forward bending while standing. (Tr. 1217). He could occasionally[3] climb stairs. *Id.*

In February 2017, Dr. Fenton completed a questionnaire. (Tr. 1212-13). He noted Plaintiff could lift or carry ten pounds. (Tr. 1212). He also checked boxes indicating Plaintiff's abilities to stand, walk, and sit were affected, but did not note how many hours Plaintiff was capable of

---

2 . The form defined "rarely" as a "significant limitation", meaning it could be performed one to five percent of a workday. (Tr. 1216).
3. The form defined "occasionally" as "some limitation", meaning it could be performed six to 33 percent of a workday. (Tr. 1216).

performing each. *Id.* He also indicated Plaintiff would be off-task over twenty percent of a workday due to pain and fatigue. (Tr. 1213)., Dr. Fenton explained: "Hernia repair. [No] lifting over 10 lbs, pushing, pulling, straining x 6 weeks postop." *Id.*

In January 2018, Dr. Peiffer completed a medical source statement. (Tr. 1751-52). She opined Plaintiff's ability to lift was affected by dizziness, and that Plaintiff should avoid lifting over five pounds occasionally, and could not lift any amount frequently. (Tr. 1751) ("[U]nable to perform a safe lift from floor level with a neutral spine. Complained of dizziness and [headache] with repeated squats."). She opined Plaintiff's ability to stand, sit, stoop, crawl, crouch, and kneel were also affected, noting Plaintiff's abilities in these and other areas were "TBD by functional capacity evaluator." (Tr. 1751-52).[4] She also noted Plaintiff would be off-task for over twenty percent of a workday due to pain or fatigue. (Tr. 1752). Dr. Peiffer cited Plaintiff's low back pain, and dizziness "with bending and rising" as the medical findings in support. *Id.*

*Mental Health*

Plaintiff reported depression and was prescribed medication by Dr. Peiffer in 2015 and 2016. *See* Tr. 737-40, 729-32, 911-15. In December 2015, Dr. Peiffer assessed major depressive disorder. (Tr. 740). In February 2016, she observed Plaintiff had normal judgment and memory, but a depressed and anxious mood and a flat affect. (Tr. 732). In April 2016, Dr. Peiffer noted similar mood and affect findings, and referred Plaintiff to psychiatry. (Tr. 915).

In April 2016, Plaintiff underwent a psychological consultative examination with Robert Dallara, Jr., Ph.D. (Tr. 900-04). Plaintiff's speech was intelligible and spontaneous with slight pressure, and his thinking was logical and clear. (Tr. 902). He described his mood as depressed,

---

4. At the top of the form, Dr. Peiffer wrote: "Please see attached notes from Edwin Shaw." (Tr. 1751).

and was "somewhat fidgety." *Id.* He was alert and oriented and Dr. Dallara estimated his intelligence to be the low-average range. *Id.* Dr. Dallara assessed major depression and assigned a Global Assessment of Functioning ("GAF") score of 55.[5] (Tr. 904).

In May 2017, Plaintiff saw Lauren Alexander, Ph.D., on referral from Dr. Peiffer. (Tr. 1518). Plaintiff reported his depression began in 2015 when he stopped working. *Id.* Dr. Alexander noted she previously performed a comprehensive psychological evaluation of Plaintiff with Alan Gilbertson, Ph.D., in 2013. *Id.* On examination, Dr. Alexander noted Plaintiff's attitude was open and cooperative; he had intact memory, and no evidence of perceptual disturbances or delusions. (Tr. 1522). He had mild impairment in attention and concentration, restless behavior, and an anxious and depressed mood. *Id.* His thought processes were mostly logical and goal-directed, but circumstantial at times. *Id.* Dr. Alexander recommended group therapy, but Plaintiff declined. *Id.*

In June 2017, Plaintiff told Dr. Alexander he had been playing golf and doing yard work to improve his mood. (Tr. 1514). He stated there had been "more ups than downs" since his prior visit. *Id.* On examination, Plaintiff had an open and cooperative attitude, intact attention, concentration, and memory, normal speech, logical and goal directed thought processes, restless behavior, depressed mood, and constricted affect. *Id*. H. Dr. Alexander assessed major depressive disorder, single episode, moderate, rule out somatoform disorder. (Tr. 1515). She assigned a GAF score of 65.[6] *Id.* Plaintiff again declined the group therapy recommendation. *Id.* Dr. Alexander

---

5. A GAF score is a "clinician's subjective rating, on a scale of zero to 100, of an individual's overall psychological functioning." *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 503, n.7 (6th Cir. 2006). A score between 51-60 indicates "moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). Am. Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders 34 (4th ed., Text Rev. 2000) ("*DSM-IV-TR*").
6. A GAF score of 61-70 indicates "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning . . . but generally functioning pretty well." *DSM-IV-TR* at 34.

noted she would be out on maternity leave and provided Plaintiff contact information for the psychologist covering for her. *Id.* He stated he would call to schedule. *Id.*

Dr. Schwarze's April 2016 to January 2018 notes indicate Plaintiff denied difficulty with concentration, memory, and decision-making. (Tr. 1222, 1225, 1228, 1232, 1235, 1670, 1746).

*Opinion Evidence*

In February 2016, Dr. Gilbertson completed a questionnaire for the State agency. (Tr. 820-21). He noted Plaintiff had depressive disorder and chronic pain. (Tr. 820). He saw Plaintiff once and referred him to pain management. (Tr. 820, 822-23). In the "medical source statement" section of the form, Dr. Gilbertson wrote something illegible.[7] (Tr. 820).

In April 2016, Dr. Dallara opined Plaintiff could understand and apply verbal instructions consistent with average intellectual abilities. (Tr. 904). He noted there was no evidence during the examination to suggest impairment in persistence and pace. *Id.* Dr. Dallara opined Plaintiff "made an essentially unremarkable social presentation", but due to his depression might have some difficulties relating to co-workers and supervisors, as well as difficulty withstanding the stress and pressure associated with day-to-day work activity. *Id.*

In May 2016, State agency physician Joseph Edwards, Ph.D., reviewed Plaintiff's records and offered an opinion regarding Plaintiff's mental functional capacity. (Tr. 104-05). He noted Plaintiff had mild restriction in activities of daily living and maintaining social functioning; he had moderate difficulties in maintaining concentration, persistence, or pace. (Tr. 104). He opined he was adopting the prior ALJ's RFC determination. (Tr. 105, 107); *see* Tr. 82-93 (prior decision). He noted that "[t]he totality of the evidence indicates a mild social impairment and no difficulty

---

7. The ALJ interpreted Dr. Gilbertson's handwriting to state Plaintiff had "minimal impairment" in all areas. *See* Tr. 21.

coping with work stress." (Tr. 107). In June 2016, state agency physician Kristen Haskins, Psy.D., confirmed Dr. Edwards's opinion. (Tr. 118-19, 121).

In December 2017, Dr. Alexander completed a mental assessment. (Tr. 1741-43). She opined Plaintiff would be able to perform the following activities, but would be "distracted from job activity[] from 11-20 percent of the work day or work week (*i.e.*, more than one hour/day or more than one-half day/week)": remember locations and work procedures; understand, remember, and carry out detailed instructions; perform activities within a schedule; sustain an ordinary routine; work in coordination with or proximity to others without being distracted; make simple work-related decisions, complete a normal workday and workweek without interruptions from psychologically based symptoms; perform at a consistent pace; ask simple questions or request assistance; respond appropriately to changes in the work setting; be aware of normal hazards and take appropriate precautions; and travel in unfamiliar places or use public transportation. (Tr. 1741-42). She opined Plaintiff would be able to perform the following activities, but would be "distracted from job activity[] more than 20 percent of the work day or work week (*i.e.*, more than one hour and up to two hours/day or one-half to one day/week)": understand, remember, and carry out short, simple instructions; interact appropriately with the general public; and maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness. (Tr. 1741). Plaintiff would be able to perform the following activities, but would be "distracted from job activity[] no more than 10 percent of the work day or work week (*i.e.*, one hour or less/day or one-half day or less/week)": maintain attention and concentration for extended periods of time; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers without distracting them or exhibiting behavioral extremes; and set realistic goals or make plans independently of others. (Tr. 1741-42). She believed Plaintiff would miss about four days of work

per month, be off-task about fifteen percent of an eight-hour workday, and need two unscheduled ten-minute breaks per day. (Tr. 1742). As the medical findings in support, Dr. Alexander wrote: "mental status evaluation" and "previous psychological testing results." *Id.*

## VE Testimony

The ALJ asked the VE to consider a hypothetical individual with Plaintiff's age, education, work experience, and residual functional capacity ("RFC") as ultimately determined by the ALJ. (Tr. 70-71). The VE responded that such an individual could perform jobs such as sales attendant, fast food worker, and housekeeper. (Tr. 71).

## ALJ Decision

In his February 21, 2018 written decision, the ALJ found Plaintiff met the insured status requirements for DIB through September 30, 2020, and had not engaged in substantial gainful activity since his alleged onset date (July 1, 2015). (Tr. 17-18). He found Plaintiff had severe impairments of degenerative disc disease – lumbar spine, obstructive sleep apnea, status post left nephrectomy, chronic kidney disease, hypertensive vascular disease, depressive disorder, and learning disorder, but that none of these impairments (singly or in combination) met or medically equaled the severity of a listed impairment. (Tr. 18). The ALJ then set forth Plaintiff's RFC:

> [T]he claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) with the following additional limitations: The claimant can frequently reach overhead bilaterally. He can frequently reach in all other directions bilaterally. The claimant can occasionally climb ramps and stairs. He can never climb ladders, ropes, or scaffolds. He can only occasionally balance, stoop, kneel, crouch, and crawl. He can only occasionally work at unprotected heights and around moving mechanical parts. He can only occasionally operate a motor vehicle. The claimant is limited to simple, routine tasks that are not performed at a production rate pace.

16

(Tr. 19). The ALJ then found Plaintiff was unable to perform past relevant work, but given his age, education, work experience, and RFC, jobs existed in significant numbers in the national economy that he could perform. (Tr. 23). Therefore, the ALJ found Plaintiff not disabled. (Tr. 24).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

## STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The

17

Commissioner follows a five-step evaluation process—found at 20 C.F.R. § 404.1520—to determine if a claimant is disabled:

1.  Was claimant engaged in a substantial gainful activity?

2.  Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3.  Does the severe impairment meet one of the listed impairments?

4.  What is claimant's residual functional capacity and can claimant perform past relevant work?

5.  Can claimant do any other work considering his residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters,* 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The ALJ considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is he determined to be disabled. 20 C.F.R. § 404.1520(b)-(f); *see also Walters*, 127 F.3d at 529.

## DISCUSSION

Plaintiff raises four challenges to the ALJ's decision. First, he argues the ALJ failed to appropriately evaluate opinions from his treating physicians – Drs. Alexander and Peiffer. Second, he argues the ALJ failed to properly evaluate Mr. Swanson's opinion. Third, he argues the ALJ erred in evaluating his subjective symptoms. Fourth, and finally, he contends the ALJ erred at Step Five. Finding merit in Plaintiff's arguments regarding Dr. Peiffer's opinion and the related

symptoms, the undersigned recommends the Commissioner's decision be reversed and remanded for further proceedings.

<u>Treating Physician Rule – Drs. Alexander & Peiffer</u>

Generally, the medical opinions of treating physicians are afforded greater deference than those of non-treating physicians. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007); *see also* SSR 96-2p, 1996 WL 374188.[8] A treating physician's opinion is given "controlling weight" if it is supported by (1) medically acceptable clinical and laboratory diagnostic techniques; and (2) is not inconsistent with other substantial evidence in the case record. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). The requirement to give controlling weight to a treating source is presumptive; if the ALJ decides not to do so, he must provide evidentiary support for such a finding. *Id.* at 546; *Gayheart v. Comm'r of Soc. Sec.,* 710 F.3d 365, 376-77 (6th Cir. 2013). When the physician's medical opinion is not granted controlling weight, the ALJ must give "good reasons" for the weight given to the opinion. *Rogers*, 486 F.3d at 242 (quoting 20 C.F.R. § 416.927(d)(2)).

"Good reasons" are reasons "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Rogers*, 486 F.3d at 242 (quoting SSR 96-2p, 1996 WL 374188, at *4). When determining weight and articulating good reasons, the ALJ "must apply certain factors" to the opinion. *Rabbers v. Comm'r Soc. Sec. Admin*., 582 F.3d 647, 660 (6th Cir. 2009) (citing 20 C.F.R. § 404.1527(d)(2)). These factors include the length of treatment relationship, the frequency of

---

8. Although recent revisions to the CFR have changed the rules regarding evaluation of treating physician opinions, such changes apply to claims filed after March 27, 2017, and do not apply to claims filed prior to that date. *See* Social Sec. Admin., *Revisions to Rules Regarding the Evaluation of Medical Evidence*, 82 Fed. Reg. 5852-53, 2017 WL 168819. Plaintiff filed his claim in January 2016 and thus the previous regulations apply.

examination, the nature and extent of the treatment relationship, the supportability of the opinion, the consistency of the opinion with the record as a whole, and the specialization of the treating source. *Id.* While an ALJ is required to delineate good reasons, he is not required to enter into an "exhaustive factor-by-factor analysis" to satisfy the requirement. *See Francis v. Comm'r of Soc. Sec. Admin.*, 414 F. App'x 802, 804-05 (6th Cir. 2011). However, a conclusory statement that a treating physician's opinion is inconsistent with the record is insufficient to satisfy the rule. *See Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 551 (6th Cir. 2010). "Put simply, it is not enough to dismiss a treating physician's opinion as 'incompatible' with other evidence of record; there must be some effort to identify the specific discrepancies and to explain why it is the treating physician's conclusion that gets the short end of the stick." *Id.* at 552.

*Dr. Alexander*

Plaintiff first objects to the ALJ's consideration of Dr. Alexander's opinion. For the reasons discussed below, the undersigned finds: 1) the ALJ correctly determined Dr. Alexander was not a "treating physician" subject to higher scrutiny; and 2) the ALJ's explanation for discounting Dr. Alexander's opinion is supported by substantial evidence. The ALJ explained:

> While Dr. Alexander is an acceptable medical source, she is not a treating source as defined by 20 CFR 404.1527(a)(2) because she and the claimant did not have and do not have an ongoing relationship. Therefore, I do not have to consider whether or not her opinion should be given controlling weight. Furthermore, I cannot give great weight to Dr. Alexander's opinion for several reasons. First, the limitations described by Dr. Alexander are internally inconsistent – she indicates that the claimant would be able to understand, remember, and carry out detailed instructions on a more consistent basis than simple work. In addition, Dr. Alexander's absence and off-task opinions are inconsistent with her own objective observations – some mild deficits in attention/concentration, a depressed mood, and an otherwise normal mental status. Finally, her opinion is inconsistent with Dr. Dallara's objective observations.

(Tr. 22).

The ALJ is correct that Dr. Alexander does not qualify as a treating source under the regulations because she only saw Plaintiff twice. *See Kepke v. Comm'r of Soc. Sec.*, 636 F. App'x 625, 629 (6th Cir. 2016) ("It was not improper for the ALJ to discount Dr. Chapman's opinion on the basis that he treated Kepke only three times over a three month period."); *Mireles x rel. S.M.M. v. Comm'r of Soc. Sec.*, 608 F. App'x 397, 398 (6th Cir. 2015) ("On appeal, Mireles claims that the ALJ rejected Dr. Jeney's 'treating source opinion' without a legal basis and ignores the lower court's classification of Dr. Jeney as a non-treating source. He fails to persuade us that the lower court misclassified Dr. Jeney, who examined S.M.M. no more than three times."); *Daniels v. Comm'r of Soc. Sec.*, 152 F. App'x 485, 491 (6th Cir. 2005) ("two visits to [a physician] within the span of a few days is not a frequency consistent with the treatment of back pain").;*Yasmin v. Comm'r of Soc.*, 67 F. App'x 883, 885 (6th Cir. 2003) ("two examinations did not give [the physician] a long term overview of [claimant's] condition"). This is so because a medical source becomes a treating source when the Plaintiff has seen him with "a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for [the] medical condition(s)." 20 C.F.R. § 404.1527(a)(2). Further, "[t]he treating physician doctrine is based on the assumption that a medical professional who has dealt with a claimant and his condition over a long period of time will have a deeper insight into the medical condition than a person who has examined a claimant but once, or who has only seen the claimant's medical records." *Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994).

Dr. Alexander's two examinations in two months is simply insufficient to establish a treating physician relationship as contemplated by the regulations. The undersigned finds unpersuasive Plaintiff's attempt to avoid this conclusion by arguing that Dr. Alexander "had the opportunity to establish a relationship with Plaintiff, conduct several examinations, and review the

previous medical records of Dr. Gilbertson." (Doc. 12, at 15). Although Dr. Alexander references a prior examination of Plaintiff she completed with Dr. Gilbertson in 2013, *see* Tr. 1518 ("This patient is known to me. I saw him for a comprehensive psychological evaluation while I was serving as a post-doctoral psychology fellow under Alan Gilbertson, Ph.D."), Plaintiff does not point to evidence of this evaluation. Nor does he point to any treatment records from Dr. Gilbertson in the record.

Because Dr. Alexander did not qualify as a treating source, the ALJ was only required to *explain*, rather than give good reasons, for discounting her opinion. *See* SSR 96-8p, 1996 WL 374184, at *7 ("The RFC assessment must always consider and address medical source opinions. If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted."). And the ALJ did just that, providing three reasons supported by the record. First, the ALJ correctly noted Dr. Alexander's opinion was internally inconsistent in that it found Plaintiff could understand, remember, and carry out *detailed* instructions for a greater portion of a workday than he could understand, remember, and carry out *simple* instructions. (Tr. 22); *see* Tr. 1741. This is a valid reason to discount opinion evidence. *Bernola v. Comm'r of Soc. Sec.,* 127 F. Supp. 2d 857, 863 (N.D. Ohio 2015) (internal inconsistency a valid reason to discount opinion evidence); *Shells v. Colvin*, 2016 WL 3027062, at *4 (N.D. Ohio) (same); *see also Render v. Sec'y of Health & Human Servs.*, 1989 WL 34104, at *3 (6th Cir.) (unpublished table disposition) (same). Second, the ALJ reasonably concluded Dr. Alexander's absence and off-task opinions (finding Plaintiff would miss about four days per month and be off-task fifteen percent of the day) were inconsistent with her relatively mild examination findings. (Tr. 22); *see* Tr. 1514 (noting depressed mood and constricted affect, but open and cooperative attitude, and no deficits in attention, concentration, or memory); Tr. 1522 (noting

anxious and depressed mood, "mild" impairment in attention and concentration, and no memory deficits). Third and finally, the ALJ explained that Dr. Alexander's opinion was inconsistent with Dr. Dallara's examination. (Tr. 22). Notably, Dr. Dallara observed Plaintiff to be "somewhat fidgety" and self-described his mood as depressed (Tr. 902), but found Plaintiff would have no difficulty with persistence or pace or with understanding and applying instructions. (Tr. 904). The consistency of an opinion with the record as a whole, as well as the opinion's supportability are regulatory factors to be considered in evaluating opinion evidence. 20 C.F.R. § 404.1527(c)(3)-(4). Each of these reasons is supported by substantial evidence in the record. And, when taken together, the undersigned finds the ALJ thus satisfied his duty to explain the weight assigned to Dr. Alexander's opinion.[9]

*Dr. Peiffer*

In contrast to Dr. Alexander, Plaintiff's primary care physician Dr. Peiffer is a "treating source" subject to the "good reasons" rule. *See* 20 C.F.R. § 404.1527(c)(2) ("We will always give good reasons in our notice of determination or decision for the weight we give your treating source's medical opinion."). The ALJ here explained:

> Despite Dr. Peiffer's status as a treating source, I cannot give her opinion controlling weight or even great weight for two reasons. First, Dr. Peiffer attributes many of these limitations to dizziness – a symptom which is not well documented in the record and one that the claimant is not being treated for. Second, aside from occasional stoop/crouch/kneel, the limitations are inconsistent with the claimant's ability to perform activities of daily living and his acknowledged improvement in back pain and ambulation.

(Tr. 22).

---

9. Moreover, even if Dr. Alexander's opinion were subject to the treating physician rule, the undersigned would find these reasons not only supported by substantial evidence, but also that they are "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the . . . opinion and the reasons for that weight", SSR 96-2p, 1996 WL 374188, at *4, thus satisfying the "good reasons" rule.

Dr. Peiffer's opinion offered restrictions on lifting due to dizziness and headache. (Tr. 1751). She also opined Plaintiff would be off-task for over twenty percent of an eight-hour workday due to pain or fatigue. (Tr. 1752). She again listed low back pain as well as "dizziness with bending and rising" as the medical findings in support of her opinions. *Id.*

The undersigned finds remand is required here because the ALJ's reasons are not supported by substantial evidence. First, the ALJ stated that Dr. Peiffer attributed many of her limitations to dizziness "a symptom which is not well documented in the record and one that the claimant is not being treated for." (Tr. 22). However, Plaintiff reported dizziness to Dr. Peiffer in December 2015 (Tr. 737) ("He continues to have dizziness that has not gone away.") and April 2016 (Tr. 911) ("Gets extremely dizzy with slight movement – has felt this way since surgery in November."). In a February 2016 consultation with Dr. Goske, Plaintiff reported visual symptoms and dizziness (though lessened). (Tr. 718). A record later that month from Dr. Goske noted Plaintiff was being evaluated for "neurologic symptoms of unknown cause." (Tr. 852). Plaintiff also reported dizziness when performing exercises for the functional capacity evaluation in August 2016. (Tr. 1214-17). Plaintiff continued to report dizziness to Dr. Peiffer in February 2017 (Tr. 1181), and saw neurologist Dr. Itrat later that month (Tr. 1634-43). Dr. Itrat noted that a "[t]rial of downgaze brings about symptoms of vertigo and [Plaintiff] is unable to keep eyes open to appreciate any nystagmus". (Tr. 1639). Dr. Itrat explained the etiology of Plaintiff's dizziness was "likely multifactorial." (Tr. 1642). He suspected it might be caused by an underlying inner ear dysfunction, or by superimposed cervical disc disease, and recommended vestibular therapy and a referral to an ENT; he also prescribed medication. *Id.* Dr. Peiffer continued to note Plaintiff's reported dizziness in April 2017 (Tr. 1274), and diagnosed both vertigo and imbalance, for which she continued the mediation prescribed by Dr. Itrat (Tr. 1278). Additionally, Plaintiff testified to

dizziness at the hearing, and explained that he had not undergone the recommended vestibular therapy for financial reasons. (Tr. 49).

Thus, the undersigned finds the ALJ's statement that Plaintiff's dizziness was "not well documented in the record" lacks the support of substantial evidence. Additionally, the undersigned finds that to the extent the ALJ relied on Plaintiff's lack of further treatment for this symptom as a reason to discount the opinion without considering Plaintiff's provided rationale for that lack of treatment, that was error. *See* SSR 16-3p, 2017 WL 5180304, at *9 (the Commissioner will not discount symptoms based on lack of treatment "without considering possible reasons [including financial reasons] he . . . may not . . . seek treatment consistent with the degree of his . . . complaints.").

Additionally, the undersigned finds the ALJ's general statement that Dr. Peiffer's opinion is "inconsistent with the claimant's ability to perform activities of daily living" (Tr. 18) likewise insufficient to satisfy the "good reasons" requirement. *See Friend*, 375 F. App'x at 552 ("Put simply, it is not enough to dismiss a treating physician's opinion as 'incompatible' with other evidence of record; there must be some effort to identify the specific discrepancies and to explain why it is the treating physician's conclusion that gets the short end of the stick."). The ALJ did not identify which activities of daily living she found to conflict with which aspects of Dr. Peiffer's opinion. *See, e.g., Greene v. Comm'r of Soc. Sec.*, 2018 WL 2093621, at *4 (S.D. Ohio) ("Specifically, while the ALJ found that 'Dr. Johnston's opinion[ ] [is] inconsistent with the [Plaintiff's] activities of daily living cited throughout medical records, including her own,', the ALJ fails to cite any specific treatment note(s) within those documents in support of such conclusory contention. Such omission is error.") (internal citation omitted). Although the Commissioner now attempts to provided that missing analysis, *see* Doc. 16, at 10, this is *post-hoc*

25

reasoning which this Court cannot accept. *Williams v. Comm'r of Soc. Sec.*, 227 F. App'x 463, 464 (6th Cir. 2007) (citing *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947)) (a reviewing court, in assessing the decision of an administrative agency, must judge its propriety solely by the grounds invoked by the agency).

The undersigned need not evaluate whether the ALJ's reasoning that Dr. Peiffer's opinion was entitled to less weight due to Plaintiff's "acknowledged improvement in back pain and ambulation" (Tr. 18) is supported. This is so because the other two reasons provided are not supported, and because the Dr. Peiffer listed both back pain and dizziness as the reasons supporting her opinion. Thus, even if substantial evidence supports the ALJ's statement regarding improvement in back pain and ambulation, remand is still required.[10]

For these reasons, the undersigned finds remand is required for the Commissioner to comply with the treating physician rule as it applies to Dr. Peiffer's opinion. *See Gayheart*, 710 F.3d at 380 ("[T]his circuit 'has made clear that [it] do[es] not hesitate to remand when the Commissioner has not provided good reasons for the weight given to a treating physician's opinion.'") (quoting *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011)) (alterations in *Gayheart*).

---

10. Additionally, the Commissioner argues that "[t]he ALJ's detailed discussion of Plaintiff's testimony and the objective evidence provided an additional good reason for discounting Dr. Peiffer's opinion." (Doc. 16, at 12). However, the *only* discussion of Plaintiff's testimony was the following:

> The claimant's alleged impairments are DDD, OSA, stage 2 kidney disease, history of kidney removal, and depressive disorder. He has stated that these impairments cause thrush, dizziness, back pain, and flank pain. In terms of functional limitations, the claimant alleges that he is unable to engage in full-time work activity. (Exhibits B2E, B14E, and Hearing testimony)[.]

(Tr. 25). The undersigned finds this discussion of Plaintiff's testimony to be anything but detailed.

"Other" Source – Mr. Swanson

An "acceptable medical source" includes "licensed physicians" and "licensed or certified psychologists." 20 C.F.R. § 404.1513(a)(1)–(2). Evidence from those who are "not acceptable medical sources" or "other sources", is "important and should be evaluated with key issues such as impairment severity and functional effects, along with other relevant evidence in the file." SSR 06-3p, 2006 WL 2329939, at *2. Interpreting SSR 06-3p, the Sixth Circuit explained that "[o]pinions from non-medical sources who have seen the [Plaintiff] in their professional capacity should be evaluated by using the applicable factors, including how long the source has known the individual, how consistent the opinion in with other evidence, and how well the source explains the opinion." *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 541 (6th Cir. 2007).

As Plaintiff acknowledges, Mr. Swanson is one of these "other sources". The ALJ considered Mr. Swanson's opinion, and explained his reasons for assigned it "little weight":

> I give little weight to Mr. Swanson's opinion for several reasons. First, Mr. Swanson is not an acceptable medical source and his opinion is not consistent with medical evidence as a whole. Furthermore, the opinion[] [is] inconsistent with Mr. Swanson's observations. For example, he noted only "some" limitation (as opposed to "significant" limitation) when sitting, standing, static standing, crouching, and kneeling, yet recommended that these activities be rarely performed during a typical workday. Further, these limitations are not consistent with the claimant's other activities of hiking and golfing.

(Tr. 21-22).

The reasons provided by the ALJ are supported, and are more than sufficient to satisfy SSR 06-3p. First, as noted above, internal inconsistency is a valid reason to discount opinion evidence. *See Bernola*, 127 F. Supp. 2d at 863; *Shells*, 2016 WL 3027062, at *4. And the ALJ accurately cited such inconsistencies, noting the Mr. Swanson indicated Plaintiff had "some" (as opposed to "significant") limitation in sitting, standing, static standing, crouching, and kneeling, but

recommended Plaintiff could only perform those activities "rarely". (Tr. 1217).[11] By contrast, Mr. Swanson also recommended Plaintiff rarely perform elevated work or walking, but indicated Plaintiff had "significant" limitation in those activities. *Id.* Second, the ALJ correctly cited that Mr. Swanson's opinion was inconsistent with Plaintiff's self-reported activities of hiking and golfing. (Tr. 22). Plaintiff argues this finding fails to take into account Plaintiff's testimony about these activities. *See* Doc. 12, at 26 ("Activities which, if they occurred, happened in 2016 (Tr. 54), and/or were performed on a limited basis at the recommendation of his psychologist (Tr. 55-56)."). The fact that these activities may have occurred in 2016 is, to the contrary, *directly* relevant evaluating Mr. Swanson's opinion because it was completed in August 2016. *See* Tr. 1214-20. Furthermore, although Plaintiff testified these activities were not extensive, Plaintiff's ability to do them provides support for the ALJ's reasoning that Plaintiff was not as limited as Dr. Swanson opined. *Compare* Tr. 1453 ("did a tunneled [sic] walking and climbing through the foothills [in] North Carolina which exacerbate[d] his low back pain"); Tr. 55 ("I don't know if was a ton of hiking . . . I mean there was . . . a little bit of walking around my mom's - - like I said her house and an old food storage thing was. . . carved in the side of the mountain.") *and* Tr. 55-56 (testifying to playing golf "[v]ery badly" and "[v]ery lightly" twice per month), *with* Tr. 1217 (Dr. Swanson's recommendations that Plaintiff only "rarely" sit, stand, or walk). SSR 06-03p merely requires the ALJ to evaluate opinions from other sources. The ALJ did so here, and his analysis is supported by substantial evidence.

---

11. The form defined a "significant" limitation as one that could be performed "rarely" or one to five percent of a workday. (Tr. 1216). It defined "some" limitation as meaning the activity could be performed "occasionally" or six to 33 percent of a workday. *Id.*

Subjective Symptom Analysis

Plaintiff next challenges the ALJ's evaluation of his subjective symptom reports. When a claimant alleges impairment-related symptoms, an ALJ must follow a two-step process to evaluate those symptoms. 20 C.F.R. § 404.1529; SSR 16-3p, 2017 WL 5180304, *2-8. First, the ALJ must determine whether there is an underlying medically determinable physical or mental impairment that could reasonably be expected to produce the claimant's symptoms. SSR 16-3p, 2017 WL 5180304, *3-4. Second, the ALJ must evaluate the intensity and persistence of the claimant's symptoms to determine the extent to which those symptoms limit the claimant's ability to perform work-related activities. *Id.* at *3, 5-8. To evaluate a claimant's subjective symptoms, an ALJ considers the claimant's complaints along with the objective medical evidence, information from medical and non-medical sources, treatment received, and other evidence. *Id.* at *5-8. In addition to this evidence, the ALJ must consider the factors set forth in 20 C.F.R. § 404.1529(c)(3). *Id.* at *7-8. Those factors include: daily activities; location, duration, frequency, and intensity of pain or other symptoms; factors that precipitate and aggravate the symptoms; type, dosage, effectiveness, and side effects of any medication taken to alleviate pain or other symptoms; treatment, other than medication for relief of pain or other symptoms; measures other than treatment a claimant uses to relieve pain or other symptoms, *e.g.*, lying flat on one's back; and any other factors pertaining to a claimant's functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. § 404.1529(c). Although the ALJ must "consider" the listed factors, there is no requirement that he discuss every factor. *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 287 (6th Cir. 2009).

The Sixth Circuit has explained, interpreting SSR 96-7p, the precursor ruling, that a credibility determination will not be disturbed "absent compelling reason." The Court is thus limited to determining whether the ALJ's reasons are supported by substantial evidence. *See*

*Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 713-14 (6th Cir. 2012) ("As long as the ALJ cited substantial, legitimate evidence to support his factual conclusions, we are not to second-guess[.]."). Nevertheless, the ALJ's decision "must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." SSR 16-3p, 2017 WL 5180304, at *10.

Plaintiff specifically contends the ALJ's subjective symptom statements are not supported and that the ALJ: 1) "failed . . . to discuss the multiple CT and MRI scans in this record"; 2) "did not acknowledge that Plaintiff's left nephrectomy was due to renal cancer"; and 3) "failed to acknowledge the relationship between Plaintiff's kidney being removed and his back problems [], and the possible relationship between all these problems and his complaints of dizziness." (Doc. 12, at 22). In conclusion, he contends "the ALJ provided the boiler plate for the decision without any evidence to support his findings." *Id.* at 23.[12] Preliminarily, the undersigned finds Plaintiff has not pointed to any error in the ALJ's failure to discuss certain evidence because he has not explained how that evidence would alter the ALJ's decision.

In his decision, the ALJ set forth the two-step process required by 20 C.F.R. § 404.1529. (Tr. 19). He then stated that "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." (Tr. 20).

---

12. Plaintiff's factual argument implicates only the ALJ's consideration of his physical, rather than mental, symptoms, and as such, the undersigned only considers that argument. *See Kennedy v. Comm'r of Soc. Sec.*, 87 F. App'x 464, 466 (6th Cir. 2003) (issues not raised in opening brief waived).

30

Throughout the next three pages of his decision, the ALJ pointed to records he reasonably interpreted as indicating Plaintiff was not as limited as he alleged. *See* Tr. 20-23. First, the ALJ explained Plaintiff's symptoms were inconsistent with the medical evidence as it related to his degenerative disc disease: *See* Tr. 20 (citing evidence of normal or improved gait, normal strength and range of motion in extremities, and negative straight leg raising tests, *see, e.g.*, Tr. 663-64, 973, 1325, 1354). Next, the ALJ also cited progress notes from Dr. Schwarze indicating Plaintiff denied difficulty, *inter alia*, walking, climbing stairs, dressing, and bathing. (Tr. 20); *see* Tr. 1222, 1225, 1228, 1232, 1235, 1670, 1746. Such inconsistencies provide the required substantial evidence to support a credibility finding. *See Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 392 (6th Cir. 2004) (proper for ALJ to discount testimony where there are contradictions in the record).

However, as set forth above, the ALJ's rationale for discounting Dr. Peiffer's opinion – because it was based on Plaintiff's subjective symptom of dizziness – is not supported by substantial evidence of record. While the ALJ acknowledged Plaintiff's testimony of dizziness (Tr. 20), his decision contains no further mention of it. The ALJ's subjective symptom evaluation was thus incomplete. Therefore, in conjunction with reevaluating Dr. Peiffer's opinion on remand as discussed above, the ALJ should also explain his consideration of this symptom in a manner consistent with SSR 16-3p.

Step Five

Because remand is required at Step Four, the Court need not reach Plaintiff's argument that the ALJ erred at Step Five.

### CONCLUSION AND RECOMMENDATION

Following review of the arguments presented, the record, and the applicable law, the undersigned finds the Commissioner's decision denying DIB not supported by substantial

evidence and recommends the decision be reversed and remanded for further proceedings pursuant to Sentence Four of 42 U.S.C. § 405(g).

   s/ James R. Knepp II
United States Magistrate Judge

*ANY OBJECTIONS* to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this notice. Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985).